(No. 15781.—Decree affirmed.)
CARL AUGUST WALTER GRANTZ *et al.* Plaintiffs in Error,
*vs.* OTTO GRANTZ, Exr., *et al.* Defendants in Error.

*Opinion filed October 28, 1924—Rehearing denied Dec. 4, 1924.*

1. WILLS—*when subsequent insanity does not affect question of testamentary capacity.* Evidence that the testator lacked mental capacity while he was a patient in a hospital for more than a year prior to his death, during which time his health steadily declined, can have no persuasive effect on the question of his testamentary capacity at the time he executed his will, two and one-half years before he went to the hospital.

2. SAME—*mere advice as to execution of will does not prove undue influence.* Mere advice of a friend as to the execution of a will, even though not given in a professional capacity as an attorney, does not necessarily show that the execution of the will was procured by undue influence, where the relation between the testator and the party giving the advice was not fiduciary.

3. SAME—*a testator may make any disposition of his property without regard to heirs.* Heirs, as such, have no vested right in the testator's estate, and a testator of sound mind and acting freely may make any lawful disposition of his property he sees fit.

4. SAME—*what practice governs consideration of evidence on a motion to direct verdict in will contest.* Where a motion is made to direct a verdict sustaining the will in a contest case the practice is the same as in actions at law, and the party resisting the motion is entitled to the benefit of all the evidence in its most favorable aspect to him and of all presumptions that may reasonably be drawn therefrom.

5. SAME—*when court may direct verdict sustaining will.* The question presented by a motion to direct a verdict sustaining the will in a contest case is whether there is any evidence fairly tending to sustain the allegations of the contestants, and if the evidence, with all the inference that reasonably can be drawn from it, is not sufficient to support a verdict for the contestants the trial court may direct a verdict sustaining the will.

6. SAME—*when lay witnesses may give opinions as to testator's mental capacity.* Lay witnesses may give opinions as to the testator's mental capacity where they were acquainted with and observed the testator and have stated ample facts and circumstances from which the jurors can form their opinion on the question.

WRIT OF ERROR to the Circuit Court of Winnebago county; the Hon. ROBERT K. WELSH, Judge, presiding.

B. A. KNIGHT, and WILLIAM D. KNIGHT, for plaintiffs in error.

EARLY & EARLY, and FISHER, NORTH, LINSCOTT & GIBBONEY, for defendants in error.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

The plaintiffs in error, heirs-at-law of J. Godfrey Grant, deceased, filed their second amended bill in the circuit court of Winnebago county to contest his last will and testament. The grounds upon which it is sought to set the will aside are testamentary incapacity and undue influence. Otto Grantz, a brother of the testator and the executor of the will, and the First Swedish Evangelical Lutheran Church of Rockford, the principal devisee and legatee, among others, were made defendants. At the conclusion of all the evidence, on motion of the proponents, the court instructed the jury to sustain the will. A verdict was so returned and a decree entered thereon, which dismissed the bill for want of equity. The record is brought here by writ of error.

The testator, J. Godfrey Grant, died a bachelor at Rockford on August 10, 1920. He had resided in that city more than thirty years. There survived him as his heirs-at-law, his brother, Otto Grantz, a resident of Rockford, and ten nephews and nieces, the children of a brother and two sisters, who had died prior to the testator's death. Of the nephews and nieces one lived in Rockford, three in Kansas and the remaining six in Sweden. The testator had been interested in various business enterprises, and left property, real and personal, valued at upwards of $100,000. His estate consisted principally of four houses and lots, and, in the aggregate, 214 shares of stock in seven corpo-

rations. His will was dated and executed on July 15, 1916, and was admitted to record by the county court of Winnebago county on October 13, 1920. The testator by the first section of his will directed the payment of his debts and the expenditure of a sum not exceeding $800 for his burial lot and a suitable monument over his grave; by the second section he devised to the First Swedish Evangelical Lutheran Congregation of Rockford three houses and lots, particularly describing them; by the third section he bequeathed to the same church the shares of capital stock above mentioned; by the fourth section he devised to certain heirs-at-law another house and lot, and to facilitate partition authorized his executor to sell and convey the property upon such terms and conditions as he might deem best and to divide the proceeds among the devisees equally, and by the fifth section he bequeathed his household goods to Alice Johnson, a niece, and the residue of his estate to his brother, Otto. Otto was appointed executor of the will.

A large number of witnesses testified upon the trial. Fifty-six were called on behalf of the defendants in error. Among these were the testator's neighbors, his associates in business, fellow-directors and stockholders, members of his church, tenants of his houses, mechanics, tradesmen, shop-keepers and acquaintances. These witnesses were interrogated concerning the circumstances under which they had met or observed the testator, and their testimony covered a period which began several years prior to the execution of the will and continued until he finally went to the hospital, early in the year 1919. One or more of them testified substantially that the testator gave considerable attention to the maintenance of his home, keeping it neat, clean and in good repair; that when improvements or repairs to his houses became necessary and were made, he knew whether the work had been properly done and the price that should be paid therefor; that he paid his bills without making errors and personally attended to his

banking business; that he was economical in his pur-
chases, shrewd in his dealings, and that he attended church
regularly and contributed to its support. Testimony was
also offered by the proponents of the will that the testator
had stated that he would give most of his property, if not
all, to the church; that some of his relatives had sufficient
means, that one or two of them did not desire any of his
estate, and that some of his nieces were too haughty.

On the part of the contestants twenty-one witnesses were
heard. Much of their testimony related to the testator's
physical condition. Hannah Eklund, a resident of Kansas,
whose sister's husband was a brother of the testator, testi-
fied that she met him at the brother's home in that State
about October 18, 1915; that while there he complained of
being dizzy, and that on several occasions she saw him cry
and rub his hands and limbs. To this witness the testator
had written a number of letters, of which thirty-three were
introduced in evidence. In nearly all of them, from 1915
to 1919, he referred to the condition of his health, gave
varying symptoms in different letters, and commented upon
the prospect of his recovery or the contrary. He wrote
that he suffered from colds, dizziness, headaches and ner-
vousness, and that he was shaky in walking, had rushes of
blood to the head and trouble with his eyes and jaws. In
one letter he expressed the belief that he had Bright's dis-
ease, but afterwards stated that a physician's examination
had convinced him that it was not his trouble. The testa-
tor also in these letters, among other things, spoke of the
weather, the crops, the prices of produce, his household af-
fairs, and of the death of his brother, whose funeral in
Kansas he was unable to attend on account of poor health.
He spoke of the World War and of other current mat-
ters. These letters, while usually limited to the common-
place, occasionally gave expression to some religious senti-
ment or made some observation on the tendencies of the
times. An examination of them fails to convince us that

they were other than the normal expressions of an uneducated man retired from active life, who was conscious of his ill and failing health.

Three doctors testified on behalf of the plaintiffs in error. Dr. Ochsner, who treated the testator in the spring of 1916, stated that he thought the testator a little "odd," but that he was "sane and understood what he was doing at all times." The testator called on Dr. Fringer twenty-seven times from May 5 to October 15, 1916. The doctor testified that in his opinion the testator was afflicted with syphilis; that this disease might affect the brain but was not likely to do so; that the germ is carried through the blood of the patient but does not necessarily lodge in the brain cells, and that by proper treatment the disease can be arrested before destruction of brain tissue results. On cross-examination Dr. Fringer stated that he had discovered nothing which would lead him to believe that the testator was insane; that such a question had never entered his mind; that the testator had always come to his office the same as any other patient, and that while doing business with him the testator had always acted rationally and sensibly. The third physician, Dr. Wilgus, a specialist in nervous and mental diseases, had never treated the testator. To him was propounded a hypothetical question embodying the substance of the testimony adduced, and he was asked whether he had an opinion as to the mental condition of the testator on July 15, 1916. He answered that he did not have "a very clear opinion one way or the other."

The testator entered the hospital early in the year 1919, approximately two and one-half years after he had executed his will, and remained there continuously until he died. Several nurses testified to facts and observations concerning the testator while he was a patient there. They said that he occasionally entered the halls improperly and insufficiently clad; that he cried, stamped upon the floor, pounded the bed, threw dishes across the room, talked in-

coherently, and refused to talk to visitors or to allow his temperature to be taken; that once he screamed about his money, because he thought some person was after it; that at another time he saw a lot of tin dippers and drinking cups playing about the room; that he thought the doctors would poison him; that because there was an electric bell at his bed, by some diabolical machine he would be electrocuted; that he would not allow a male nurse who was in attendance to enter the room because he thought the nurse would kill him, and that he had to be moved because he objected to the fire-escape light.

A review of the evidence convinces us that the testator did not lack testamentary capacity at the time he executed the will. His health was impaired for a considerable period before his death, but in the year 1916, so far as the record shows, he was in full possession of his mental faculties. No fact or circumstance was shown to the contrary. His letters written at that time do not show any mental derangement or testamentary incapacity. They contain complaints and criticisms such as a person in his situation would naturally make, but they also contain observations upon existing conditions and current events which evince keen discrimination. The medical testimony, too, is consistent with the testator's testamentary capacity. While one physician, Dr. Fringer, testified that syphilis might produce unsoundness of mind, yet he admitted that it was unlikely to do so. He further testified that he had seen nothing to cause him to believe the testator insane, and that the testator had always acted rationally and sensibly in his presence. There was no testimony by any witness that the testator's mind had been actually affected by the disease. The only evidence which tends to show that he lacked testamentary capacity is that which relates to the period when he was a patient in the hospital. That period began two and one-half years after he had executed the will and continued about nineteen months, until his death. Even if his departures from nor-

mal expression and conduct during his long stay in the hospital, while his health steadily declined, can be held to show delusions on his part, yet they occurred so long after the execution of the will that they can have no persuasive effect upon the question of his testamentary capacity in July, 1916.

Before the will was drawn the testator prepared a memorandum containing the substance of the will he proposed to make. He took this memorandum to A. T. Lindgren, a fellow-member of his church and secretary of a building association, sought his advice and requested him to draw the will. After discussing the matter with the testator Lindgren found the task too complicated and suggested that he employ a certain lawyer to draw the will. The suggestion was followed, the will was drawn in Lindgren's absence, and after it had been executed the testator placed it in a vault in Lindgren's office for safe keeping. The plaintiffs in error contend that Lindgren procured the execution of the will by undue influence. The charge cannot be sustained. The testator had the right to seek advice from a third person even though he was not a lawyer. There was nothing in the relationship between the testator and Lindgren which made it a fiduciary one. Nor does the record disclose the exercise of undue influence over the testator by Lindgren or by any other person.

No attempt was made by the plaintiffs in error to show that the testator intended to make a will different from the one he did make, or that he regarded his relatives with that affection which might create an inference or presumption that he would necessarily consider them the objects of his bounty. He left neither widow nor descendant, and his will carried out his deliberate and expressed purpose to leave the major portion of his estate to the church he had long attended. He did not ignore all his relatives, for he devised a house and lot to some of them, bequeathed certain

chattels to a niece, and the residue he gave to his brother. Heirs, as such, have no vested right to the testator's estate, and a testator of sound mind and acting freely may make any lawful disposition of his property he sees fit to make. *Marshall* v. *Moon,* 311 Ill. 605; *McGrady* v. *McGrady,* 298 id. 129.

The plaintiffs in error argue that in a will contest the statute requires the issues of testamentary capacity and undue influence to be submitted to a jury, and that the trial court erred in directing a verdict sustaining the will. When a motion is made to direct a verdict in a will contest the practice is the same as in actions at law, and the party resisting the motion is entitled to the benefit of all the evidence in its most favorable aspect to him and of all presumptions that may reasonably be drawn therefrom. The question presented by a motion to direct a verdict in such a case is whether there is any evidence fairly tending to prove the cause of action or fact affirmed. (*Yess* v. *Yess,* 255 Ill. 414; *Lloyd* v. *Rush,* 273 id. 489.) If the evidence, with all the inferences that reasonably can be drawn from it, is not sufficient to support a verdict for the contestants, so that if such a verdict were returned it would have to be set aside, then the trial court may direct a verdict.

Complaint is made that certain lay witnesses were permitted to testify that in their opinion the testator was sane, without requiring them to detail sufficient facts and circumstances as the basis of their opinion. All of these witnesses had been acquainted with and had observed the testator, and they, with other witnesses, stated ample facts and circumstances from which the jury could form their own opinion of the testator's mental capacity. The evidence was competent. *Austin* v. *Austin,* 260 Ill. 299.

Finally, complaint is made that the trial court erred in excluding evidence tending to compare the conduct of the testator when he was alleged to be insane with a time when he was sane. There was no proof that the testator was in-

sane when the will was executed, hence the evidence was properly excluded.

The record discloses no evidence fairly tending to show that the testator was of unsound mind or that the will was procured by the exercise of undue influence, and it is otherwise free from prejudicial error.

The decree of the circuit court is therefore affirmed.

*Decree affirmed.*