Orlean Liston Brown Johnson et al., Appellees, v. First Union Trust and Savings Bank, as Executor and Trustee Under the Last Will and Testament of William L. Brown, Deceased, et al., Appellants.

Gen. No. 36,337.

474

Opinion filed February 7, 1934. Rehearing denied February 26, 1934.

JOHN R. COCHRAN, ROYAL B. CUSHING, ASHCRAFT & ASHCRAFT, ROSENTHAL, HAMILL & WORMSER, BUTLER, POPE, BALLARD & ELTING and TENNEY, HARDING, SHERMAN & ROGERS, for appellants; WILLARD L. KING and THOMAS E. FISKE, of counsel.

KIRKLAND, FLEMING, GREEN & MARTIN, TAYLOR, MILLER, BUSCH & BOYDEN and URION, DRUCKER, BISHOP & BOUTELL, for appellees; WEYMOUTH KIRKLAND, FRANCIS X. BUSCH, HOWARD ELLIS, JAY FRED REEVE and PRESTON BOYDEN, of counsel.

MR. JUSTICE WILSON delivered the opinion of the court.

This is an appeal from a decree of the circuit court entered upon the verdict of the jury in a will contest case involving the will and two codicils executed and published by the testator, William L. Brown.

The bill charges that the testator was mentally incapable of executing the instruments in question and

also that he was in a weakened mental and physical condition as the result of taking drugs and that the will and codicils were executed by the testator under the dominating influence of certain individuals who had entered into a conspiracy to obtain his property.

The will was executed at Chicago, Illinois, May 31, A. D. 1919, shortly after the death of his wife. He left no child nor lineal descendant.

The contestants are:

Helen Louise Brown, a half sister, and a legatee under the will to the amount of..............$25,000

Arthur Hintze, the surviving husband, and Jane Hintze, the daughter of Mary Brown Hintze who was in turn the daughter of Hiram Liberty Brown, a brother of the testator. Mary Brown Hintze has died since the starting of the litigation and her heirs have been substituted. They are legatees under the will to the extent of...............................$25,000

George Drew Brown, age *83* years, a brother and *non compos mentis*, appearing by Helen Louise Brown, as guardian, who was to receive the income for life on a trust fund under the will to the amount of...$25,000 Upon the death of George Drew Brown the principal amount of this trust fund was to go to Claribelle Rice, a daughter of the contestant Helen Louise Rice.

Walter H. Brown, a half nephew..........$10,000
Bessie Brown, wife of Walter H. Brown....$10,000
William Brown Winslow, a grandson of Helen Louise Rice ...............................$1,000

Orlean Liston Brown Johnson and Delia Brown Wentz, granddaughters of Henry Martin Brown, a half brother ..............................*nothing*

Kate M. Northcott Graves, daughter of Isabelle Jane (Brown) Northcott, a sister of the testator, concerning whom he said in the codicil of January 30, 1928: "My sister, Isabelle Jane (Brown) Northcott of

Luray, Virginia, having died and her heirs having been amply provided for, I hereby revoke, cancel and annul the provisions made in my said will dated May 31, 1919." ...............................*nothing*

In addition to the amounts provided in the will, the testator from time to time prior to his death made frequent gifts to his next of kin and provided for and paid the expense of the education of some of the younger members of his collateral family. These gifts appear from the letters of the testator and the diary kept by him during the course of his life. In one of the letters dated July 15, 1919, it appears that he had made loans from time to time to Walter Brown, aggregating approximately $10,000, and was canceling the indebtedness and making him a gift of that amount. It also appears that he gave him money at different times to start in business and from an entry in his diary dated July 18, 1922, testator made a gift to the said Walter Brown in the amount of $7,000 with which to purchase a home. Another entry shows a gift to this legatee of stock of the value of $17,600. For his incompetent brother, George Drew Brown, during his lifetime he created a trust of approximately $40,000 and upon the default of certain bonds belonging to the trust fund, other securities were substituted by the testator and the trust made good. His diary shows a gift in 1921 of stock in the amount of $11,000 to his half sister Helen Rice who took care of his demented brother George Drew Brown, but this care seems to have been provided for out of the trust fund created. After the provisions for the contestants, already referred to, the balance of the estate was distributed among the proponents, as follows:

Presbyterian Hospital ...................$75,000.00
Chicago Memorial Hospital ............... 35,000.00
Evanston Hospital Association ........... 20,000.00

| | |
|---|---:|
| Glenwood Training School | 10,000.00 |
| Chicago Orphan Asylum | 10,000.00 |
| The Home for Destitute Crippled Children. | 10,000.00 |
| The Country Home for Convalescent Children | 10,000.00 |
| The Orchestral Association of Chicago.... | 10,000.00 |
| Rollin T. Woodyatt ''to be used by him in research work or for such other charitable purpose as he may elect''. | 35,000.00 |
| Rollin T. Woodyatt, Individually | 10,000.00 |
| Charles D. Ewer, the testator's secretary.. | 5,000.00 |
| Frank Phillips, the testator's chauffeur.... | 5,000.00 |
| Harriet Seymour Carscallen, a niece. of testator's wife | All household furniture and personal effects. |

First Trust and Savings Bank of Chicago, as Trustee, to pay the income for life to Harriet Seymour Carscallen, and upon her death to divide the principal among the charitable legatees previously mentioned in proportion to the amounts specified in the will, all the rest and residue of the estate.

Prior to the execution of the will in May, 1919, the testator had been in active business in the City of Chicago and had built up a reputation as one of the outstanding men in the Chicago district. He was one of four men who organized the original partnership of Pickands Brown & Company. The other three men were Henry S. Pickands, Samuel Mather, and J. C. Morse, all of Cleveland, Ohio. Subsequently, the Cleveland members of the firm dropped out of the organization and Charles P. Wheeler, and Charles T. Boynton, both of Chicago, became associated with the testator in the company under the name of Pickands Brown & Company. This partnership continued for several years and, on January 1, 1904, an agreement was entered into between the parties to that partner-

ship, under which it was agreed that a corporation was to be organized under the laws of the State of West Virginia to take over the property of the partnership and to distribute the stock. Of this stock the testator received 5,548 shares, Wheeler 5,250 shares and Boynton 4,200 shares. One share each was also allotted to two other persons whom it is not necessary to mention. It was provided in the agreement that none of the partners should sell or dispose of his stock until he had first offered it to the other parties to the agreement on terms as favorable as it could be sold to other parties, but not to exceed the book value of the stock. It was also mutually agreed that the agreement should extend to and be binding upon the heirs and legal representatives of the parties thereto.

Considerable stress has been laid upon the fact in the argument of counsel for contestants that Wheeler was instrumental with others in procuring and bringing about the making of the will in the manner in which it was done, because of his interest in the stock and his efforts to procure the same. We have referred to this agreement executed in 1904 in order to show that the arrangement with regard to the stock was in the minds of all the parties long before the making of the will and that it was intended to keep and maintain the corporation as a close corporation for the benefit of the original parties and their families. The firm was a personal service corporation doing a commission business. Its success was dependent upon the personal efforts and the business relationships of the three individuals constituting the corporation. In addition to his interest in the firm of Pickands Brown & Company, the testator was interested in other companies including the American Ship Building Company, of which he was an officer for a number of years; the Federal Furnace Company and the Embree Iron Co. which owned and operated a blast furnace in Ten-

nessee. He was also at one time connected with the By-Products Coke Oven Company whose output was sold through the Pickands Brown & Company. The testator appears also to have been interested in the organization of the Steel and Tube Co. of America, which included certain properties such as the Marks Company at Indiana Harbor and the Iroquois Iron Co.

In 1919, at the time of the making of the will, Brown's estate was estimated at around $1,000,000, and at the time of his death it was worth approximately $2,000,000. What it is worth now is problematical.

In 1919, he was maintaining his home and residence in Evanston, Illinois, but spending a large part of his time in California and had practically retired from business. While not actively engaged in the affairs of Pickands Brown & Company, he was, however, receiving a salary of $50,000 per year in addition to the dividends on his stock.

In 1921, an agreement was entered into between the testator, Wheeler and Boynton, under which the latter acquired an option to purchase the stock of the testator at $100 per share within a certain fixed time after his death. As a part of the agreement and as a further consideration for its execution, it was agreed that the testator was to receive a yearly salary of $25,000 for five years. This salary was not mentioned in the contract, but was in fact paid. In 1928, testator sold the balance of his stock at a price of $100 a share to his associates in the Pickands Brown & Company and in addition to that his associates, purchasers of the stock, agreed to pay him a salary of $12,000 a year so long as he lived.

It is urged for our consideration that Wheeler and Boynton had procured the stock at a price below its book value and that this was accomplished because of the domination of these two individuals with others

over the testator. We have no means of knowing or ascertaining at this time what the present value of the stock is but in view of the fact that, within a very short period of time after the final sale of this stock by the testator to his associates, the financial crash occurred and the period of depression began, we might well come to the conclusion that the testator was not over-reached in the deal. So far as this record discloses it is practically conceded that, up to the first of May, 1919, the testator was not only a man in full possession of all his mental faculties, but that he was exceptionally well qualified as an executive and a man of business.

In April, 1919, the testator and his wife were staying at the Hotel Del Monte in Monterey, California. Mrs. Brown had been an invalid for several years prior to this time and was only able to get about with the help of a wheel chair. At that time the testator was subject to bronchial asthma and about the 19th of that month he contracted a bad cold which developed into pneumonia. He became rapidly worse and ran a temperature of about 103 degrees the first few days and later developed a severe case of hiccups which was practically uncontrollable. At this time he was given digitalis to strengthen the heart action, and was being attended by Dr. Teaby, the house physician. Boynton, testator's associate in the Pickands Brown & Company, made arrangements with the Southern Pacific Railroad Company, as a result of which, two private cars were provided for the purpose of bringing testator and his party to Chicago. Accompanying him on the train were Mrs. Brown, Boynton, Albert Day, president of the Presbyterian Hospital, Dr. Fuller, a physician of Chicago, Mrs. Fuller, Benjamin F. Wright and M. McMenamin. In addition there were two professional nurses, Mrs. Brown's maid and the chauffeur Frank Phillips. In the course of the trip

Mrs. Brown died suddenly of a heart attack. The train arrived in Chicago on May 4th and the testator was taken immediately to the Presbyterian Hospital. At this time he was very weak and unable to do very much talking and part of the time his mind was rambling. After May 6th, his temperature was normal, and he conversed with those around him sanely and coherently. The attending physician was a Dr. Koessler, who has since died, and the interne at the hospital was Dr. Raymond Thompson who had charge of the patient under the charge of the directing physician. The testator was discharged from the hospital on June 3, 1919. According to the hospital records and the testimony of the interne Thompson, the testator was not running any temperature after May 5th and the digitalis, a preparation used to strengthen the heart, was discontinued on May 23rd. From the hospital records it appears that there had been a prescription for Mr. Brown on May 7th, of 10 heroin tablets of 1/24 grain each. Thompson testified in regard to this that it was the only narcotic prescribed and that the patient would not have received more than 10 tablets of 1/24 grain each without having another written order; that this was an absolute rule as it was covered by the narcotic law; that the patient could not have received more than 10 tablets during his stay in the hospital, and may not have received all of that number and, in his opinion, it was far from enough to produce a habit. We speak of this at this time because it is upon this prescription and the testimony of the nurse McPhaden, that counsel for the contestants base their argument that he was rendered mentally incapable of resisting the dominating influence of others—this on the assumption that the testator continued the use of such drugs during his stay in the hospital and after leaving it.

According to the allegations of the bill the testator in 1919 was 77 years of age and had suffered from violent attacks of asthma; that to counteract the effects of these he had been given large doses of morphine and other drugs; that he suffered delusions and hallucinations as to his relatives and, by reason of a weakened will power, easily became susceptible to influence which he was unable to resist; that the death of his wife about this time, together with the administration of drugs and narcotics, affected his mentality so that he was deprived of his free will; that prior to 1919 he was a habitual user of strong liquor and stimulants; that he was removed as manager of Pickands Brown and was unable to comprehend the nature and extent of his property; that he did not know who were the natural objects of his bounty; that for many years Mrs. Carscallen was attentive to decedent and a woman of dominant will power and personality; that she persuaded testator to dispose of his residence in Evanston and move to California and live with her, which he did; that the same Mrs. Carscallen took complete charge of the testator in the hospital and excluded the complainant and the brothers and sisters of the testator and close friends from conversing with him. The bill further charges that Wheeler and Boynton, his business associates, dominated the testator and with Mrs. Carscallen obtained his complete trust and confidence and thereby created a fiduciary relationship between the testator and each of them.

In the beginning it is well to clear up certain allegations of the bill. There appears to be no evidence showing that the testator was, prior to 1919, a habitual user of strong liquor nor is there testimony to the effect that he had been using morphine or other drugs and narcotics. There is no testimony to the effect that Mrs. Carscallen or others prevented complainant or testator's brothers and sisters or his

friends from seeing or conversing with him while he was in the hospital in 1919. The testimony, so far as the record discloses, shows that during the entire time he was in the hospital he was visited by his relatives and, in fact, his chauffeur was sent to bring them. He was also visited by a number of friends, many of whom testified at the trial.

The original will was executed at the hospital, May 31, 1919. The first codicil was executed January 28, 1925, at Pasadena, California. The second and last codicil was executed January 30, 1928, at Pasadena, California. Prior to the execution of the will of May 31, 1919, the testator had executed a codicil to his will while in the hospital which was witnessed by the witness McPhaden and nowhere in the proceeding has she expressed an opinion as to the mental capacity of the testator. This codicil is not in the case, however, as it was supplanted by the will executed May 31, 1919.

In order to consider the execution of the will and codicils logically, we deem it advisable to consider the facts with reference to the execution of each of the instruments separately.

The will provided that Wheeler and Boynton, his partners, would have the right to purchase his stock within six months after his death at the book value of the stock on the date of the sale and that a certificate be signed by these two and filed with the executor which should be taken as to the book value of said stock and should be final. The will also provided that after the payment of legatees, expenses, etc., the residue should go to Harriett Seymour Carscallen, a niece of his deceased wife. Ten thousand dollars was to go to Dr. Rollin T. Woodyatt, whose mother was a first cousin of testator's wife. From the facts it appears that Mrs. Carscallen was a sister-in-law and also a cousin of Charles F. Wheeler. The relationship of

these parties, together with the fact that Woodyatt and Mrs. Carscallen were related to testator's wife and not by blood to the testator, is stressed for the purpose of showing the interest of these three parties in an attempt to influence the distribution of testator's estate.

When the testator was in the hospital, in addition to his physician Dr. Koessler and the interne Thompson, he was attended by two nurses, one taking care of him during the day and the other one at night. The day nurse was Sarah McPhaden and the night nurse was Jessie Levanger.

Three experts testified for the contestants. These were McNally, Tenney and Rankin. None of these experts had ever seen or talked with the testator. The gist of their testimony was that a drug addict had certain symptoms which, being present, indicated the condition. These were constipation, pin point pupils, excessive perspiration, telling lies, no regard for money, no will power, no regard for family or friends. Taking these symptoms prior to the execution of the will of May 31, 1919, we find that there is in the record no evidence of constipation prior to that date. On the other hand, the hospital record shows just the contrary. There is no evidence in the record showing that the testator had pin point pupils. There is no evidence of excessive perspiration nor telling of lies, neither is there any evidence of a disregard for his money so far as we can see it and no evidence of lack of will power. There does not appear to be anything showing a disregard of friends or relatives. On the other hand the testimony appears to be that he was in fact fond of his friends and his distribution of funds among his various relatives and his communications with them seem to indicate the contrary.

The expert testimony, based on the evidence of the nurse McPhaden, was to the effect that in their opin-

ion the use of heroin in sufficient quantities from the time he entered the hospital to the day of the execution of the will, May 31, 1919, might create a drug habit. She testified that during his stay at the hospital there was a P. R. N. order, every three or four hours whenever necessary. This was the testimony taken during her Chicago deposition. At the trial she testified that she gave testator heroin at the Presbyterian Hospital as the doctor ordered, which would be "as necessary" and she stated that that was two or three times a day. The deposition of this witness was taken twice and she also testified at the trial and there is some force in the argument that her testimony with regard to the use of the heroin became stronger upon each occasion. In her first deposition no reference whatever was made to the administration of drugs or narcotics to the testator. This witness also testified that when Mr. Brown was at the hospital he had a bedroom and a sitting room with a door between and that from her seat at a desk in the hall, she had a view of the doors leading into Mr. Brown's two rooms; that Mrs. Carscallen came to the hospital nearly every day and would remain in the room continuously from the time she came until the early afternoon. We cite this testimony because of the fact that it is insistently urged in the brief for contestants that Mrs. Carscallen hid in one of the rooms while the testator was talking to relatives and friends in the other. This is not borne out by the evidence.

During this stay of the testator in the Presbyterian Hospital in Chicago, a number of witnesses testified on behalf of the proponents of the will as to testator's mental capacity, together with the facts upon which they based their opinion.

Thompson, the interne who was on duty 24 hours, was in charge of the case under Dr. Koessler, the attending physician who has since died. Thompson tes-

tified, as already stated, that the testator could not have received more than 10 tablets of heroin during the entire time he was in the hospital and that this was not enough to produce a drug habit or to do any harm to the patient.

Miss Levanger, the night nurse, testified that shortly after his entry into the hospital he would be up part of the time and later on toward the last he would be fully dressed and taking automobile rides in the afternoons; that in her opinion he appeared to be perfectly well; that he was not delirious while he was in the hospital and that in her opinion he was of absolutely sound mind; that he was given digitalis and heroin of the strength of 1/24 of a grain; that these doses were very small and would not affect the patient; that he was never dopey or unresponsive and had no appearance whatever of being a drug addict.

Kemper K. Knapp, a reputable lawyer of Chicago who prepared the will, testified that he had many business transactions with the testator dating back to 1900 and that he had represented him on several occasions as his lawyer. In the course of the preparation of the will Knapp made four visits to the hospital and stated that he had observed no difference in testator's mental condition from that which he had observed for the 20 years preceding 1919; that he was sociable and had a number of friends, knew what he wanted, was willing to receive suggestions but was positive in his character and that in his opinion he was of sound and disposing mind and memory on May 31, 1919. It has been insisted that Knapp was the attorney for Wheeler, but this fact is not borne out by the record. He did perform services for the firm of Pickands Brown & Company and may have performed services for the other partners in addition to the testator, but we see no force in this argument. The law firm with which Knapp was connected repre-

sented the executor of the estate, but Knapp by an instrument in writing has waived all claim to any fees which may be earned by his firm growing out of services rendered the executor of the estate.

Leonard F. Martin, an attorney associated with Mr. Knapp, saw the testator while he was in the hospital, and testified that in his opinion he was of sound mind and memory.

Albert M. Day, who was president of the Presbyterian Hospital and an old friend of the testator, testified that he had known testator intimately for 40 years and was with him in Del Monte in April, 1919, and had played golf with him prior to his illness; that he saw the testator frequently while he was in the hospital and talked with him at length and was of the opinion that he was of sound mind and mentally capable.

The Rev. John R. Hunter of California stopped in Chicago in May, 1919, and visited the testator at the hospital, and testified that he talked with him and that he was in full possession of his faculties.

Harriet Seymour Carscallen testified that she came to Chicago in response to a telegram from Boynton stating that her aunt had died on the trip; that she visited the testator nearly every day during the month he was in the hospital; that she frequently took rides with him in the automobile, but did not know of the execution of the will except that testator introduced her to Mr. Knapp as his niece who was to benefit thereunder; that she did not talk with him about the contents of the will; that he was in her opinion fully competent and capable of making a last will and testament.

Dr. Rollin T. Woodyatt, who had known the testator for a number of years and had been his physician from 1907 to 1919, testified that he visited him at the hos-

pital and found that his mind was clear and that he was capable of transacting business.

Charles Wheeler, a partner and intimate friend of the testator, testified that he saw him nearly every day at the hospital and that the testator discussed business conditions with him and asked about the members of his, Wheeler's, family, and also about his friends in the steel business and that in his opinion Brown was of sound and disposing mind and memory at that time. Wheeler testified that the testator discussed with him the making of a new codicil to his old will and that he dictated to him certain items which he desired to have changed and these were written by Wheeler on the back of an envelope and transmitted by him to Knapp. This fact has been urged by contestants as an indication of the domination of Wheeler over the testator, but the fact is that this codicil was subsequently supplanted by the new will itself, as already stated. The testator, himself, later on May 26, outlined the directions and terms of the will which was subsequently executed May 31, 1919. It was based upon this memoranda that Knapp prepared the will and which the testator read over before signing. These directions are so clear and so indicative of a mind free from mental disturbances that we feel that it should be set out in full. The document, which was written by the testator in his own handwriting, follows:

"May 26

"Dear Mr. Knapp

"As arranged I enclose memorandum for will which you can now make including in it the codicil made on the 24th. If the memo is not clear to you please let me know by telephone or otherwise as you think best the main thing being that now that I have got at it

would like to see it all in proper shape by an early date.

Yours truly
W. L. Brown.

In the list I have named the relationship where it exists but do not particularly care to have it done in the will unless you think it essential and particularly because some are really half nephews and nieces.

| | |
|---|---|
| Isabelle Jane (Brown) Northcott of Luray, Virginia (my sister) or in the event of her decease to her daughter Kate M. Northcott | 50,000.00 |
| Helen Louise (Brown) Rice (my sister) of Chicago, Ill. | 25,000.00 |
| Hiram Liberty Brown (brother) St. Joseph, Michigan *or his heirs* | 25,000.00 |
| George Drew Brown (brother) Chicago 25,000.00 in Trust. The income to be paid to him semi-annually and after his decease the principal to be paid to Clarabelle Rice spinster (my niece). | |
| Walter H. Brown (nephew) Pasadena, Calif. | 10,000.00 |
| Wm. Brown Winslow (grandnephew) Chicago One Thousand —————————————— | 1,000.00 |
| Rollin T. Woodyatt, Chicago | 10,000.00 |
| Henry Wilson Park Custis Barber, Chicago (godson) my watch and chain | |
| Harriet Seymour Carscallen—Chicago all the remainder of my estate but in case of her decease to go to the same charities and in same proportions as those to be given from the proceeds of the stock of Pickands B. & Co." | |

No witness testified that during this period of time the testator was other than mentally capable of making and executing the will in question. We cannot help reach the conclusion in view of the evidence that at the time of the execution of this will the testator was of sound and disposing mind and memory. There is no evidence that Wheeler or Mrs. Carscallen had anything to do with the preparation of the will or were present at the time of the writing of the letter of May 26 by the testator, upon which the will is based, or at the time of the execution of the will itself.

Upon his discharge from the hospital the testator took up his residence in his home at Evanston, Illinois. With him at this time were Mrs. Carscallen and her sister and Sarah McPhaden, the nurse. While he was in the hospital and also during the time he was in his home at Evanston, the testator had discussed with Mrs. Carscallen the question of buying a home in Pasadena and selling the Evanston property. An understanding was arrived at, as a result of which Mrs. Carscallen was to take charge of the Pasadena home and shortly after this discussion the Evanston house was sold. It appears from her testimony that during the time he was in Evanston he selected the furniture which he wished taken to California and supervised its packing and decided what was to be left. A home was subsequently purchased at Pasadena, California, and Mrs. Carscallen was placed in charge. The nurse McPhaden accompanied testator to the Evanston home and from there she accompanied the testator and Mr. Boynton, testator's partner, to Port Arthur, where she remained until October. According to her testimony she was with the testator continuously with the exception of a few days when he went fishing up the Nipigon river; that all three of them lived at a hotel in Port Arthur. Mr. Boynton has since died, so that his testimony as to what took place at Port Arthur is not obtainable.

After leaving Port Arthur, testator went to a shooting club at Rockwood, Michigan and Sarah McPhaden went to her home at Toronto, where she remained a week or more. According to arrangements she later met the testator at the Blackstone Hotel at Chicago where they remained two or three weeks. From there she proceeded to the testator's home on El Molino avenue in Pasadena and arrived there shortly before Thanksgiving. She remained with the testator as his nurse at this home until February 15, 1920, at which time she was released from further service. The facts concerning her release from service are not in evidence as testimony upon that question was ruled out by the court and will be considered upon the discussion of the question of contestants' assignment of cross errors.

The nurse McPhaden testified that while in Evanston and shortly after leaving the Presbyterian Hospital she had in her possession heroin which had been given her by Dr. Koessler, the testator's attending physician. As we have already pointed out, Dr. Koessler has since died so that the court and jury were deprived of his testimony. Sarah McPhaden testified further that while in Evanston she gave the testator heroin whenever necessary and, in fact, quite often as he did not have the strength to fight off his coughing; that what she gave to him was pursuant to the doctor's orders; that when she went to Port Arthur she had some of this narcotic with her which she had obtained from the physician; that she administered heroin every two or three hours when necessary and that she did not think she ever missed a day. She stated that the patient's condition was aggravated because of heavy dampness and fog; that there were very many of these damp bad days; that she continued this practice with reference to the heroin from the time they left Chicago until she left Pasadena; that testator would have hard coughing spells and that there would be beads of perspiration on his forehead. This

witness further testified that from the day they left the hospital until she left Pasadena the testator had never received any adrenalin, hypodermically or otherwise. The nurse McPhaden testified on cross-examination that heroin cannot be obtained except on the prescription of a physician and that this narcotic, as well as others of similar kind, are never administered except under the directions and orders of the physician in charge of the case. It is generally conceded that the Federal Narcotic Law prevents the general sale of such substances. This witness McPhaden testified that while they were in Port Arthur she used to leave these tablets (heroin) beside his bed and let him take them himself. It is hard to conceive the fact that a trained nurse would permit a patient under her charge to have free access to such a dangerous habit producing narcotic.

In contradiction to the testimony of the witness McPhaden as to the weather at Port Arthur while she and the testator were there, several letters of the testator were introduced in evidence, one dated August 26, 1919, to McKenzie, the lawyer, acknowledging receipt of two letters from him and stated that he had been on the Nipigon river where he had spent a week on a very satisfactory outing and that the weather was beautiful. On August 30, 1919, he wrote to Harvey Brown of Cleveland, ''I am finding this place very satisfactory and each week shows good progress toward renewed health.'' On September 1, 1919, he wrote McKenzie a letter in which he said: ''The weather here continues very satisfactory and am making progress favorably.'' On September 12, 1919, he again wrote McKenzie a letter in which he said: ''The weather here continues very satisfactory and each week brings me some improvement.'' An attempt was also made by proponents to introduce in evidence the monthly record of the weather report of the Dominion of Canada covering this particular location, but its

admission was objected to by counsel for contestants as not properly proven so that it is, therefore, not in the record.

The nurse McPhaden's testimony as to the administering of heroin to the testator is contradicted by Dr. Huber, a witness for proponents, who was an assistant to Dr. Koessler, the attending physician.

Dr. Huber testified that he saw the testator three to five times between the first of June and the middle of July while he was at Evanston and stated that he did not believe Dr. Koessler was at that time going to the Evanston home to see the testator; that during his, Huber's, visits he found the testator in good condition and up and about; that he, himself, did not prescribe any heroin and neither did Dr. Koessler; that testator had a bed sore which healed completely; that he did not recall his having any asthma at this time; that he, Huber, had been associated with Dr. Koessler for some time and never knew of his giving heroin to an asthmatic patient.

Effie Sherwin testified that she was engaged in Pasadena as a nurse for testator in December, 1922, and continued in that position until the time of his death, with the exception of certain periods when she was absent on leave; that during the last two years of his life she was with him continuously; that during the entire time she never gave any heroin to the testator but had given him six or eight doses of codein, which he did not care to take; that she never at any time saw any evidence that testator was a narcotic addict and that he never asked for any narcotic from her; that at one time testator had a bad attack and a physician was called in who gave him a morphine hypo and left 2 tablets which were not used. The witness testified further that she gave testator adrenalin during an asthmatic attack, at first in tablets and later hypodermically.

Dr. Sherry, a witness called by contestants, stated that he first met testator in the fall of 1922, and visited him a great number of times from then on until 1929; that asthma was the main feature of the case which is manifested by shortness of breath and a choking sensation; that the testator's main relief was from medicine known as adrenalin; that this was prescribed by him and that it was administered hypodermically; that he showed Frank Phillips, the testator's chauffeur, how to administer it and that he had never seen the testator under the influence of drugs or narcotics except when he was operated upon at the Pasadena Hospital, which was on the 9th of May, 1928.

Dr. Pinness testified that he became acquainted with the testator in May, 1926; that he is a specialist in allergic diseases, which includes the group known as asthma, hay fever, eczema and hives; that he saw him a great number of times in 1926, 1927, 1928 and 1929; that he had a complete record of the prescriptions which he wrote for the testator and one contained $\frac{1}{2}$ grain of codein to the dose; that this amount can be sold over the counter and is found in the ordinary cough syrup; that it would have no permanent effect upon the patient nor was it habit forming; that in November, 1927, he gave a prescription which was hypodermic tablets of codein sulphate; that while this was a narcotic, it was not sufficient to create a habit; that he gave him a solution of fedrin inhalant; that he knew that the testator was taking adrenalin hypodermically; that this is not a narcotic but is used frequently by asthmatic patients; that during his visits to the testator he discussed books, paintings and various subjects with him and that he never at any time heard or saw anything that would indicate that the testator was wanting in mental capacity; that his mental condition was no different when he first saw him in May, 1926, until he saw him last in September, 1929; that he believed he was of sane and sound mind

and found him always solicitous of the welfare of his family and friends; that the testator told him he was particularly interested in the research work of Dr. Woodyatt of Chicago and that he was very fond of him and that he had given him some money in his early career in order to encourage him in his research work; that he never remembered the testator ever having been given heroin and remembered only the one occasion he was given morphine.

Dr. Skeel testified that he was a medical director of the Occidental Life Insurance Company of California and was well acquainted with the testator and saw him on numerous occasions. This witness .was Mrs. Carscallen's brother-in-law. Dr. Skeel testified further that he called frequently at the residence of the testator and talked with him about the adrenalin treatments which he was receiving for his asthma and the testator told him he was grateful to find something that relieved him as effectively; that adrenalin hypodermically administered, or otherwise, could not have the slightest effect upon the mind or mentality; that the mental condition of .the testator was above the average and he saw him up until the time of his death.

It would be impossible to discuss the evidence of the various witnesses as to the condition of the mind of the testator from the time he left the Presbyterian Hospital in 1919, until his death, because of the number.

Hulda Johnson, the maid; Baxter, the boatman; Dr. Chislett, a Chicago surgeon who was in California nearly every winter; Dr. Roberts, the oculist in Pasadena who took care of the testator's eyes and met him upon frequent occasions, all testified that he was of a kindly and sociable disposition, perfectly sound mentally and capable of transacting business. Dr. Roberts, the oculist, testified that he never observed anything about Brown that appeared queer or unusual. Helen Gustavson, the cook at the Pasadena home; Agnes

Lundin, the parlor maid; Katherine Egan, a stenographer who took dictation from him two or three times a week; Elmira Luebke, a teacher in the Pasadena schools; Lassiter, who was the cook and cabin boy on testator's boat; Harry Lonsdale, an actor; Lester Shanks, captain on testator's yacht; Fred Brown, his tailor; Frank Case, manager of the Crags Country Club, of which the testator was a member, in addition to a long line of distinguished men, friends and acquaintances including such names as A. Muller-Ury, the distinguished portrait artist, who painted the testator's picture in 1924, and saw the testator frequently in Pasadena. This man described the testator as a sincere, wonderful personality and an intelligent business man and that he was very keen mentally; Henry G. Dalton of Cleveland, chairman and a director of the board of the Youngstown Sheet and Tube Co. and a friend of the testator's for many years; Alexander F. Banks, president of the Elgin, Joliet & Eastern Railroad; E. J. Buffington, for many years president of the Illinois Steel Company; Alva T. Story, superintendent of the duck club, located on the Point Mouilee property, of which Brown was a member, who stated that until 1925 testator never missed a year's attendance; Fayette Brown of Cleveland, a member of the duck club; William B. Bangs, manager of the Chicago Club, to which the testator belonged; Joseph R. Julin, secretary of the First Union Trust and Saving Bank of Chicago, and a number of friends who saw him frequently in California, including John H. Hardin, an optical manufacturer; Moise Dreyfus, who is in the iron and stone quarrying business; Moses Born, a clothing manufacturer of Chicago; William A. Dyche, business manager of the Northwestern University; Silas H. Strawn, a lawyer of Chicago; Bernard E. Sunny, for a number of years president and afterwards chairman of the Illinois Bell Telephone Company; Conrad H. Poppenhusen, a lawyer; George P.

Merrick, a lawyer; Ira C. Copley, a member of Congress for a number of years and the owner of several newspapers in California; Frank O. Lowden, former governor of Illinois; Thomas Taylor, for a number of years a judge of the circuit court of Cook county and Dr. W. L. Teaby, a witness called by the contestants, who described the testator's daily life as that of a sane individual and normal.

In addition to these witnesses a number of letters from the testator to numerous individuals were introduced in evidence covering a period of time from 1918 up to the time of his death. These letters include business communications in regard to his affairs, letters to friends and letters to his attorneys and the members of his firm. There were a great number of these letters. From none of them does it appear that there was any indication that the testator was other than a man in the full possession of his faculties.

Testator was a member of the board of directors of the First National Bank and, in 1923, established an agency account with that bank for the safe-keeping and custody of various securities. Julin, a witness already referred to, was secretary of an affiliate of that bank, and took care of his interests and collected dividends and cut coupons in order to deposit them to testator's account. The testator wrote Julin frequently in regard to what should be done with his income. These letters are clear, direct and concise. It would be impossible to quote from the great number of letters and communications, but we cannot help referring to certain communications as indicative of his grasp of business affairs. In May, 1927, he wrote Julin that he noticed that the common stock of the Chicago & Northwestern Railroad was advancing in price and that if it reached 95 he wished to sell 200 shares of the stock which was held in trust. In view of what has transpired in the financial world this letter is significant. In September, 1927, he directed the sale of 100 shares

of Peabody Houghteling & Co. stock. He suggested in another letter the substitution of other securities in the trust estate created for his brother George Drew Brown by the sale of Wilson & Company convertible bonds and the purchase of other securities if the interest on these bonds was not paid. In January, 1928, he wrote to Mr. Shannon, an officer of the bank, suggesting that he was inclined to sell his shares in the Whitestone Company and giving his reasons. The Whitestone Company operated the Drake Hotel and has since gone into the hands of a receiver. But one inference can be drawn from a perusal of these communications and letters, namely, that his mind was unclouded by the use of drugs or narcotics and that he was a man capable of transacting business in a degree above the average. In addition to these letters his diary is in evidence which contains a statement of his financial position at the end of each year from January, 1921, to the date of his death.

On January 28, 1925, he executed the first codicil to his will at Pasadena. By this codicil he cut Mrs. Carscallen from an outright interest in the residue of his estate to a life estate with the remainder after her death to certain charities specified in the will. In this codicil it was also provided that if the book value arising from the sale of his stock in the Pickands Brown & Company should exceed $100 a share, the excess should be paid to Mrs. Carscallen instead of to the charities. By this codicil the will was reaffirmed except as modified by the codicil.

On January 8, 1925, he wrote a letter to Knapp, the attorney at Chicago, in which he stated that after a conference with Mr. Wheeler he was canceling the codicil of November 6, 1920 (which is not involved in this proceeding) in which he embodied some changes in his will and particularly with reference to the Pickands Brown & Company stock. This letter is clear, concise and intelligent. Upon receipt of this

letter the codicil was prepared and returned to the testator who thereupon took it to the Security First National Bank in Pasadena where it was executed by him and witnessed by Russell Ball, A. J. Hay and C. J. Hall, officers of the bank. No one was present at the execution of this codicil to the will except the testator and those named who signed as witnesses. These men have testified that in their opinion, at the time of the execution of this codicil, testator was of sound and sane mind and in the full possession of his faculties.

In January, 1928, the testator sold the balance of his stock in the Pickands Brown & Company to the sons of Wheeler and Boynton. In addition to the price received for the stock the purchasers agreed to pay testator $16,000 for the first year after the sale and $12,000 a year for every year thereafter so long as the testator lived. On January 19, 1928, testator wrote to Knapp, his attorney in Chicago, requesting him to prepare an additional codicil to his will. On January 20, 1928, he added a postscript to the communication. This communication is so indicative of his grasp of the situation and the thorough knowledge of the testator as to his previous will and codicil, that we feel it important to make it a part of this opinion. It reads as follows:

"1289 South El Molino Avenue
Pasadena, California
January
Nineteenth
1928

"Mr. K. K. Knapp,
Continental National Bank & Trust Company Bldg.,
Chicago, Illinois.
"Dear Mr. Knapp:
"I have sold all of my stock in Pickands, Brown & Company to my partners in interest, so that it will be

necessary for me to make a codicil practically largely in place of the one I made January 28, 1925, this codicil to cancel all bequests made based upon this stock. I think all of this basis is covered in the codicil made on the above mentioned date, altho if on examination of the original will and other codicils you find it necessary to make other changes in connection with the Pickands, Brown & Company stock, please do so. Assuming I am correct about the entire matter, the Pickands, Brown & Company stock covered in that codicil and including part of Paragraph Tenth (B), which reads: 'All sums realized from the sale of such stock in Pickands, Brown & Company in excess of the par value thereof, etc.' will be cancelled.

"Then following all this I wish the bequests to be made as follows: I give and bequeath as follows:

"$75,000. to the Presbyterian Hospital of the City of Chicago for General Endowment Fund.

"$35,000. to the Chicago Memorial Hospital of Chicago, Illinois, for the establishing and maintaining of a room in said Hospital in memory of my deceased wife, Catharine Seymour Brown, to be known as the Catharine Seymour Brown Memorial Room.

"$20,000. to the Evanston Hospital Association of Evanston, Illinois, for a General Endowment Fund to be known as the Catharine Seymour Brown Memorial Endowment Fund.

"$10,000. to the Glenwood Training School of Chicago Heights, Illinois.

"$10,000. to the Chicago Orphan Asylum of Chicago, Illinois.

"$10,000. to the Home for Destitute Crippled Children of Chicago, Illinois.

"$10,000. to the Country Home for Convalescent Children of Du Page County, Illinois.

"$10,000. to the Chicago Orchestral Association of Chicago, Illinois, to be applied on its mortgage indebtedness.

"$35,000. to Rollin T. Woodyatt, of Evanston, Illinois, to be used by him for research work, or such other charitable purpose as he may elect. And I expressly direct that his use of the sum shall not be subject to any restriction, nor shall he be required to report the use thereof, but such use shall be wholly within his own discretion.

"You will notice that these bequests as outlined above are all practically the same as in the other codicil.

"I also wish included in the codicil the following bequests:

"To Charles D. Ewer of Chicago, Illinois, $5,000.

"To Frank Phillips, of Pasadena, California, my faithful employee for many years, $5,000.

"I also wish to cancel the following which you will find in my original will:

" 'Article I. I give and bequeath to ISABELLA JANE (BROWN) NORTHCOTT, of Luray, Virginia, or in the event of her death prior to my death, to her daughter, KATE M. NORTHCOTT, the sum of Fifty Thousand ($50,000.) Dollars.'

"I am making this cancellation because my sister, Mrs. Northcott, died about seven years ago and her heirs have been amply provided for since.

"I shall be glad to have this codicil drawn and sent to me at as early a date as practicable, and if there are any questions that arise in your mind in respect to it, if necessary please use the wires freely.

"Very truly yours,

WLB:KCE (Signed) W. L. Brown

"P. S. If Mr. Knapp is absent, please have Mr. Campbell give this matter attention as I am quite anxious to have it done at as early a date as possible.

January 20th, 1928.

"P. S. Since writing the enclosed letter, I have quite carefully looked over the codicil dated the 28th day of January 1925 and note that ARTICLE ELEVENTH of that codicil alludes to certain paragraphs in it, so that possibly the new codicil may conflict in its paragraphs with those mentioned in ARTICLE ELEVENTH of the former one. Of course, it is quite possible and probable that this will also be immediately noticed by you, still I thought it well to call your attention to it that you might see that the new codicil, as it will be drawn, does not conflict with those paragraphs alluded to in ARTICLE ELEVENTH of the old codicil.

(signed) W.L.B."

This codicil was prepared and returned to the testator and again the testator went to the Security First National Bank of Pasadena, where this last codicil was again witnessed by the same persons who had witnessed a previous codicil of 1925. The witnesses to this codicil have testified that, in their opinion, testator was of sound and disposing mind at the time of its execution. It amounts to a republication of the will and if there was any question as to the validity of the original will, it was removed by the execution of this last codicil. *Hobart v. Hobart,* 154 Ill. 610.

Mrs. Carscallen's interest in the estate was unchanged; all the stock of the Pickands Brown & Company had been sold, so that neither Wheeler nor Boynton nor their heirs could have profited by its execution. There is in the record no evidence that anyone attempted to influence the testator at the time of its

execution and the evidence is uncontradicted that it was executed by him alone and out of the presence of any of the so-called conspirators whom it is claimed might have been benefited by his previous will and codicil.

Contestants have assigned as cross error the action of the chancellor in refusing to admit in evidence testimony to the effect that while the testator and the nurse McPhaden were in Port Arthur he proposed marriage to her and that later at Pasadena when this fact came to the knowledge of Mrs. Carscallen and Wheeler they protested vigorously against his undertaking any such step and influenced him against entering into any such relationship with the nurse McPhaden. This was after the execution of the will and eight or nine years prior to the last codicil. It was intended by this evidence to show their domination over the testator. It had no place in the record and was entirely unrelated to the execution of the will or any codicil. According to the offer of proof, the nurse McPhaden would have testified that she would have married the testator if there was a definite understanding that she was to be the real Mrs. Brown. If she was willing at this time to enter into a matrimonial relationship with the testator, it must be self evident either that the testator at this time was not mentally deficient and the drug addict claimed by contestants, or else she was willing to enter into a contractual relationship with one wholly incapable of becoming legally obligated. We prefer to give her the benefit of the doubt and must assume that she considered him capable of contracting the marital relationship.

Cross error is assigned on the refusal of the chancellor to admit the testator's will of 1907. It has been the rule, as laid down by the Supreme Court of this State, that where the terms of such a will are at va-

riance with the contested instrument, it is not admissible. *Pollock v. Pollock*, 328 Ill. 179.

We find no error in the action of the chancellor in rejecting certain other evidence particularly with regard to the joint rental of a safety deposit box in the Union Trust & Savings Bank at Pasadena, California, in 1920, by the testator and Mrs. Carscallen nor did the court err in refusing to admit the letters of Sarah McPhaden to the testator in February and March of 1920. These letters could in no way be binding upon anyone and were properly excluded.

The entire theory of contestants' case rests upon the assumption that Wheeler, Mrs. Carscallen and others conspired together for the purpose of inducing the testator, a man addicted to the use of drugs, to change his will in favor of the conspirators. In our opinion the question of mental incapacity is entirely out of the case as the evidence is overwhelmingly in favor of the presumption that he was of sound and disposing mind during the entire period from the time of the making of the original will, May 31, 1919, until his death.

The testimony to the effect that he was addicted to the use of drugs is based entirely upon the testimony of the nurse McPhaden, and the testimony of three expert witnesses who never saw the testator and whose testimony was based upon evidence as to a hypothetical man. The courts of this State have repeatedly held that such expert testimony is generally discredited and regarded as the most unsatisfactory part of judicial administration. This, because of the fact that it has become well known that experts are hired partisans and testify for a monetary consideration. *Opp v. Pryor*, 294 Ill. 538.

From the cross-examination of certain witnesses testifying on behalf of the proponents, certain isolated facts testified to were segregated in order to help work out a foundation for the hypothetical questions pre-

sented to the experts. An attempt was made to show that the testator was a liar because he made statements as to certain capacities in which he served during the Civil War. There was no testimony to refute these statements. It was also stated by a witness that he, testator, stated to this witness that he was interested at one time with Frick of Pittsburgh in a proposition in Oklahoma. The witness, introduced by the proponents, who took care of his affairs, testified that he did not know of any such deal. This testimony, of course, was negative and, consequently, of no effect. Certain other instances are cited, none of which appeal to this court as indicating that the testator was other than the man portrayed by the evidence of his friends, namely, a man of good character, truthful and extremely well thought of.

Courts will not deal in surmises and conjectures. Charges of conspiracy must be based upon facts. Of the conspirators charged with exercising undue influence in the procurement of the will and codicils, Mrs. Carscallen was the only one who directly benefited. Wheeler was related to Mrs. Carscallen, but this alone was not sufficient to charge him with a conspiracy unless coupled with some interest. It is claimed that his interest was in having the testator provide for the purchase of the stock in Pickands Brown & Company by Wheeler and Boynton at a certain price, as shown by the books of the company and that this price was below its actual value. This agreement had been in force and effect as between Brown, Boynton and Wheeler, the three owners of the company, from 1904. It was a business proposition and Wheeler was justified in attempting to see that this business arrangement was carried out.

It is charged that Dr. Albert M. Day, president of the Presbyterian Hospital, had brought pressure to bear upon the testator to induce him to leave a sub-

stantial bequest to the hospital. Dr. Day, himself, received no pecuniary benefit from this bequest as he was the honorary president of the institution and received no salary.

Dr. Rollin T. Woodyatt received for research work a certain amount under the terms of the will, but there is no evidence that he was present at any time at which the will or any of its codicils were made and executed.

As we have already pointed out, however, when the final codicil was executed in Pasadena on January 30, 1928, Mrs. Carscallen received no benefit by reason of the addition of the codicil, and the stock of Pickands Brown & Company had been entirely disposed of, so that Wheeler's interest, if any, was nil.

The fact that Knapp, the attorney, may have also been the attorney for Wheeler does not necessarily indicate undue influence by Wheeler. Knapp had been attorney for Brown in a number of instances long before the execution of the will. *Britt v. Darnell,* 315 Ill. 385.

In order to invalidate a will it is necessary that the undue influence charged shall have been exercised and directly connected with the execution of the instrument and operate at the time of its execution. It must be such as to destroy the freedom of the testator's will and render the instrument more the offspring of the will of another than that of the testator. Mere persuasion or decision or the influence of affection is not regarded by law as undue influence. *Biggerstaff v. Wicks,* 348 Ill. 129; *Jones v. Worth,* 319 Ill. 235. Even though it might possibly have been assumed that the testator was addicted to the use of narcotics, nevertheless, this would not invalidate the will unless the testator was under the effect of such drugs or opiates at the time of the execution of the will and thereby render him incapable of executing the instrument. *Long v. Brink,* 353 Ill. 549; *Greenlees v. Allen,* 341 Ill. 262;

*Slingloff v. Bruner,* 174 Ill. 561; *Bradley v. Palmer,* 193 Ill. 15. There is no evidence in the record to the effect that the testator was, at the time of the execution of any of the instruments involved in this contest, under the influence of any drug or narcotic.

In conclusion let us say that in this case the testator had no children. *Grantz v. Grantz,* 314 Ill. 243. He was apparently greatly attached to his niece, by marriage, Mrs. Carscallen, who lived with him and his wife from childhood except during certain years when she was in Europe and in school. He apparently had a strong affection for his business associates who treated him, in our opinion, fairly and with generosity during the years he was in California and inactive in business and the mere persuasion of these, or advice given which might have to some extent influenced him in the making of his will, was, nevertheless, insufficient to deprive him of his power to leave his property as he wished. *Greenlees v. Allen,* 341 Ill. 262.

The presumption of sanity at the time of the execution of the will must be indulged in favor of the testator and the rule applied in some jurisdictions that if there is any evidence, even a scintilla, tending to support the plaintiff's case, the cause must be submitted to the jury, is not followed in this State. The test is whether there is evidence in the record which, with all its reasonable inferences taken in the aspect most favorable to the contestant, may be sufficient in law to support the cause of action. *Greenlees v. Allen,* 341 Ill. 262.

It is urged that the fact that the jury returned nine special verdicts in favor of the contestants adds strength to their position, but in view of the fact that there was no evidence whatsoever of mental incapacity, the three special verdicts finding such to be the fact are entirely unsupported by any evidence. This would indicate that the jury had not given much

thought to the testimony and, consequently, weakened its general verdict in all other respects.

The trial court in passing upon the motion for a new trial stated that he was of the opinion that the jury would find, as he believed they should, that there was no lack of testamentary capacity. If the chancellor believed that the testator was mentally sound he should have removed that question from their consideration.

After a careful consideration of all the evidence in the case, we are forced to the conclusion that the testator was in all respects and at all times possessed of the necessary testamentary capacity to execute the will and the codicils in question. We are also of the opinion that the testator was not addicted to the use of drugs or narcotics, nor are we of the opinion that there was sufficient evidence showing that undue influence exercised at the time of the making of the will or either of the codicils, which would indicate they did not express the real intention of the testator. We find the charge of conspiracy is not borne out by the evidence and particularly are we impressed with the fact that when the final codicil to the will was executed in January, 1928, it was by the testator alone and not surrounded by any facts or circumstances which would indicate that it was the result of influence brought to bear by others. The entire transaction during the 10 years from the time of the execution of the original will in 1919 and until the codicil in January, 1928, appears to have been pursuant to a plan in the mind of the testator which he consistently carried out to its final conclusion.

This case took several weeks to try. The depositions of a great number of witnesses were taken which necessarily must have been at a very considerable expense. The value of the estate has evidently depreciated by reason of the lapse of time since the probation of the will. Upon the evidence contained in this record the

chancellor should have directed a verdict in favor of the proponents of the will and entered a decree in conformity thereto.

We have been asked to reverse this cause with a finding of fact. Paragraph 119 of the old Practice Act, section 120, Cahill's Illinois Revised Statutes, ch. 110, provides that the Appellate Court may find the facts differently from those of the trial court, except in a chancery proceeding. Paragraph 7 of the Statute on Wills, Cahill's Illinois Revised Statutes, ch. 148, provides that any contestant may appear and by his or her bill *in chancery* contest the validity of the will.

In view of these enactments, this court is without power to reverse with a finding of fact, as requested by the proponents of the will.

For the reasons stated in this opinion, the decree of the circuit court will therefore be and hereby is reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded.*

HALL, P. J., and HEBEL, J., concur.